# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FORTRESS CREDIT ADVISORS LLC,

Plaintiff,

v.

TWG DEVELOPMENT, LLC, LOUIS KNOBLE, and JUSTIN COLLINS

Defendants.

Case No. 1:26-cv-06735-PAE

## AMENDED COMPLAINT[1]

Plaintiff Fortress Credit Advisors LLC ("Fortress") for its complaint against Defendants TWG Development, LLC ("TWG"), Louis "Tony" Knoble ("Knoble"), and Justin Collins ("Collins" and together with TWG and Knoble, "Defendants") alleges as follows:

**NATURE OF THE ACTION**

1. This action arises from Defendants' deliberate breach of ~~a~~their binding obligations (the "Binding Obligations") under an August 29, 2025 ~~Letter of Intent~~Term Sheet (the "~~LOI~~Term Sheet," an excerpt of which is attached hereto as Exhibit ~~A) they~~B) executed ~~with~~between Defendants and Fortress in connection with Fortress's proposed approximately $81.2 million investment in TWG and related transactions with entities owned and controlled by Knoble and Collins (~~together,~~collectively the "Transaction").

2. Defendants TWG, Knoble, and Collins induced Fortress to devote substantial time, professional resources, and capital to an intensive due diligence and documentation process by making two central, binding commitments in the ~~LOI:~~Term Sheet: first, that they would "negotiate

[1] Pursuant to paragraph 3(I) of this Court's Individual Rules and Practices, attached as Exhibit A is a redline showing all differences between the original and amended complaint.

exclusively and in good faith" with Fortress to finalize the Transaction; and second, that if the required third-party consents acceptable to Fortress (defined in the ~~LOI~~Term Sheet as the "Phase 1 Consents") were not obtained, they would reimburse Fortress for the substantial out-of-pocket costs it incurred in pursuing the deal.

3. Fortress relied on those commitments and spent months analyzing the Transaction, performing due diligence, and working with outside counsel and accountants to move the deal toward closing. In early 2026, however, Defendants abruptly reversed course, sought to re-trade material terms, and repudiated the Transaction and their Binding Obligations under the Term Sheet.

4. Defendants ~~then~~also disavowed the very reimbursement obligation that the parties had negotiated to induce Fortress to perform its work and protect it if the Transaction failed.

5. Fortress brings this action to hold Defendants to their bargain and recover the damages caused by Defendants' breach, including at least $1,905,647.25 in unreimbursed Transaction costs, ~~benefit-of-the-bargain damages to be proven at trial,~~ reasonable attorneys' fees and costs pursuant to Section 7 of the ~~LOI~~Term Sheet, and ~~declaratory~~such other and further relief ~~confirming Defendants' contractual obligations~~the Court deems just and proper.

## PARTIES

6. Plaintiff Fortress Credit Advisors LLC is a limited liability company formed under the laws of Delaware with a principal place of business at 1345 Avenue of the Americas, 46th Floor, New York, NY 10105.

7. Defendant TWG Development, LLC is a limited liability company formed in the state of Indiana with a principal place of business at 1301 E. Washington Street, Suite 100, Indianapolis, IN 46202. On information and belief, the members of TWG Development, LLC are Knoble and

Collins, each a citizen of Indiana, such that TWG is a citizen of Indiana for purposes of 28 U.S.C. § 1332.

8. Defendant Louis "Tony" Knoble, is the Chief Executive Officer and Co-Founder of TWG and, upon information and belief, is a residentcitizen of Indiana., domiciled in Carmel, Indiana. He executed the LOITerm Sheet on behalf of TWG and separately in his individual capacity as a "Key Principal."

9. Defendant Justin Collins is the Chief Finance Officer of TWG and, upon information and belief, is a residentcitizen of Indiana., domiciled in Fortville, Indiana. He executed the LOITerm Sheet in his individual capacity as a "Key Principal" (with Knoble, the "Key Principals").

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different States (and, to the extent applicable, citizens of a State and citizens or subjects of a foreign state), and the amount in controversy exceeds the jurisdictional minimum of the Commercial Division of the Supreme Court of the State of New York, County of New York$75,000, exclusive of interest and costs. Fortress seeks damages of at least $1,905,647.25, plus interest, attorneys' fees, and costs.

11. Fortress is a Delaware limited liability company with its principal place of business in New York. Fortress's members include at least 17 entities organized under the laws of Delaware, Cayman Islands, and/or the Emirate of Abu Dhabi of the United Arab Emirates, and numerous individuals who are citizens of the United States or subjects of foreign states. No member of Fortress, or partner or owner of any such member, at any tier, is a citizen of Indiana.

12. The matter in controversy exceeds $75,000, exclusive of interest and costs. Fortress seeks at least $1,905,647.25 in out-of-pocket Transaction-related costs and expenses that Defendants

have refused to reimburse, additional damages in an amount to be determined at trial, pre- and post-judgment interest, and reasonable attorneys' fees and costs pursuant to Section 7 of the Term Sheet. The aggregate amount in controversy substantially exceeds $75,000.

13. This Court has personal jurisdiction over TWG pursuant to New York Civil Practice Law and Rules ("CPLR") 301 and 302 because TWG purposefully transacted business with Fortress in New York, entered into the August 29, 2025 LOITerm Sheet with Fortress knowing Fortress was acting from New York, agreed that the LOITerm Sheet would be governed by New York law, and engaged in negotiations and other Transaction-related communications directed into New York giving rise to Plaintiff's claims. In addition, TWG consented in Section 6 of the LOITerm Sheet to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, City of New York. Personal jurisdiction is also independently proper under Fed. R. Civ. P. 4(k)(1)(A) and N.Y. CPLR 302.

14. This Court has personal jurisdiction over Knoble pursuant to CPLR 301 and 302 because, acting individually and as a controlling principal of TWG, he purposefully transacted business with Fortress in New York, participated in negotiation and Transaction-related communications directed into New York, executed the LOITerm Sheet in his individual capacity, and the claims against him arise directly from those New York-directed activities. In addition, Knoble consented in Section 6 of the LOITerm Sheet, which he executed in his individual capacity, to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, City of New York. Personal jurisdiction is also independently proper under Fed. R. Civ. P. 4(k)(1)(A) and N.Y. CPLR 302.

15. This Court has personal jurisdiction over Collins pursuant to CPLR 301 and 302 because, acting individually and as a controlling principal of TWG, he purposefully transacted business with Fortress in New York, participated in negotiation and Transaction-related

communications directed into New York, executed the LOITerm Sheet in his individual capacity, and the claims against him arise directly from those New York-directed activities. In addition, Collins consented in Section 6 of the LOITerm Sheet, which he executed in his individual capacity, to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, City of New York. Personal jurisdiction is also independently proper under Fed. R. Civ. P. 4(k)(1)(A) and N.Y. CPLR 302.

16. Venue is proper in the Southern District of New York County pursuant to CPLR 503 and the parties' forum-selection agreement28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Borough of Manhattan, City of New Yorkthis District, including negotiations, communications, and breaches related to the LOI.Term Sheet. Venue is also proper because Defendants agreedconsented in Section 6 of the LOITerm Sheet to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, City of New York.

17. This action was originally filed in the Supreme Court of the State of New York, County of New York, and Defendants removed to this Court on August 6, 2026 pursuant to 28 U.S.C. § 1441(a).

**STATEMENT OF FACTS**

18. On August 29, 2025, Fortress, on the one hand, and TWG, Knoble, and Collins, on the other hand, executed a LOIthe Term Sheet, together with an attached Term Sheet (the "Term SheetExhibit A "Outline of Proposed Terms and Conditions" (the "Proposed Terms"), that amended and restated in its entirety a prior term sheet dated May 21, 2025.

19. The LOITerm Sheet set forth the material terms and conditions of the Transaction, which contemplated, inter alia, Fortress's proposed approximately $81.2 million investment in

TWG, together with related transactions involving Knoble and Collins. The signature page likewise reflects that, in addition to TWG's execution of the ~~LOI~~Term Sheet, Knoble and Collins each separately signed in their own capacities as Key Principals.

20. Although the ~~LOI~~Term Sheet contemplated that ~~the broader Transaction~~ additional matters would ~~later~~need to be ~~documented~~resolved and memorialized in a definitive ~~agreements~~agreement before the Transaction could be consummated, it expressly imposed several binding obligations on the parties. In particular, Section 2 of the Term Sheet provides that Sections 2 through 10 constitute "Binding Obligations" that are "binding on the Parties under all circumstances."

21. Among other things, the ~~LOI~~Term Sheet granted Fortress an exclusive due diligence period through June 30, 2026~~,~~ (the "Due Diligence Period"), during which the parties were to conduct diligence and negotiate definitive documentation (the "Definitive Documentation," as defined in the Term Sheet) to effectuate the Transaction.

22. Section 4(a) of the ~~LOI~~Term Sheet further ~~provided~~provides that, during that exclusivity period, TWG and the Key Principals were required to negotiate exclusively and in good faith with Fortress with the goal of finalizing and executing Definitive Documentation before the Due Diligence Period expired.

23. Section 4(b) of the ~~LOI~~Term Sheet separately provides that if ~~consents acceptable to Fortress~~the Phase 1 Consents were not obtained before the Due Diligence Period expired, TWG and the Key Principals would, on a joint and several basis, reimburse Fortress on demand for all out-of-pocket costs and expenses incurred by or on behalf of Fortress and its affiliates in pursuing the Transaction, including, without limitation, the costs of drafting and negotiating Definitive Documentation.

~~expenses incurred by or on behalf of Fortress and its affiliates in pursuing the Transaction, including, without limitation, the costs of drafting and negotiating definitive documentation.~~

24. The Term Sheet likewise makes clear that one of TWG's businesses, Big Red Liquors, Inc. ("BRL"), was embedded in the deal structure in multiple material respects.

25. For example, the negotiated ~~Term Sheet requires~~Proposed Terms require: (i) consent approving the pledge of BRL shares, to the extent necessary, to be provided as part of the Phase I Consents; (ii) pledges of BRL shares as "Additional Security" for Fortress's protection; and (iii) distributions from BRL into a waterfall distribution to be paid to Fortress.

26. The Proposed Terms set forth in Exhibit A to the Term Sheet were not merely aspirational or incidental. They constituted the material terms and conditions of the Transaction that Fortress and TWG had negotiated over several months, beginning with the original May 21, 2025 term sheet that the Term Sheet amended and restated, and that the parties had agreed would frame their subsequent good-faith negotiations toward Definitive Documentation. The Proposed Terms were the material deal architecture within which the parties' binding duty to "negotiate exclusively and in good faith with [each other] with the goal of finalizing and executing Definitive Documentation" (Term Sheet § 4(a)) required them to operate.

27. Among the material terms central to Fortress's decision to enter into the Term Sheet, commit substantial time and resources, and forgo other investment opportunities were: (i) the approximately $81.2 million investment and the agreed allocation and uses of those funds, including repayment of existing third-party debt; (ii) the minimum return and related payment mechanics, which established the core economics of the investment; (iii) the priority and distribution provisions, which protected Fortress's return and downside position; (iv) the collateral package, including the pledge of shares in TWG's liquor business, BRL, and other agreed security; (v) the personal guarantees and related collateral pledges that provided additional credit support; (vi) Fortress's

governance, oversight, removal, and exit rights; and (vii) the required third-party approvals and organizational changes necessary to close the Transaction. These terms defined the Transaction's size, economics, security, governance, and conditions for closing.

28. These provisions were the product of extensive arm's-length negotiations and reflected the specific economic, structural, and governance architecture that defined the Transaction Fortress was being asked to fund. Fortress's decision to enter the Term Sheet and to incur the substantial costs alleged herein was made in reliance on these material terms.

29. Additionally, Schedule 1 of the Term Sheet ("Schedule 1") of the Term Sheet identified that one use of the FortressFortress's investment would be to pay down existing debt provided by a third-party lender (the "Third-Party Lender"). While Fortress was aware of the debt, TWG had failed to disclose to Fortress that TWG's relationship with the Third-Party Lender had deteriorated, requiring it to obtain substitute debt on an expedited basis.

30. In reliance on Defendants' binding commitments, from September 2025 through the middle of February 2026, Fortress devoted substantial time, effort, and expense to evaluating the Transaction and moving it toward closing. In particular, Fortress hired outside counsel to draft various contracts necessary for the proposed Transaction, form the necessary companies, and conduct legal due diligence. Fortress also retained external accountants to conduct the financial due diligence necessary and appropriate for an $81 million investment.

31. Fortress's out-of-pocket costs and expenses for this work totals $1,905,647.25.

1. On information and belief, in December 2025 or January 2026, without Fortress's consent, TWG obtained a term loan, which it used to refinance the existing Third-Party Lender debt. With new money in hand, TWG decided it no longer needed Fortress's investment and stopped working in good faith toward closing.

In particular, 32. Until early 2026, the parties actively worked toward satisfying the Phase I Consents. TWG's Vice President of Operations, Bridget Hilts, and its General Counsel, Dustin Detzler, transmitted to Fortress a series of consent requirements from TWG's third-party lenders and investors.

33. Fortress cooperated with these requests. Among other things, Fortress provided or worked to provide executed non-disclosure agreements, fund financial statements, entity and formation information, organizational documents, and background-check consent and release forms for the requisite Fortress principals, and coordinated the formation of the deal-specific investing entity to facilitate obtaining the Phase I Consents.

34. While Fortress worked to move forward with the Transaction, by January 2026, TWG began to repudiate its Binding Obligations under the Term Sheet. TWG failed to provide meaningful comments on drafts of key Transaction documents—including the loan documents, the operating agreement, and the joint venture agreement—and left critical items on the parties' legal checklist unaddressed, thereby stalling progress toward Definitive Documentation and closing. The joint venture agreement, for example, awaited TWG's review since at least December 12, 2025.

stalling progress toward definitive documentation and closing. The joint venture agreement, for example, has been awaiting TWG's review since at least December 12, 2025.

35. On information and belief, in December 2025 or January 2026, without Fortress's consent, TWG obtained a term loan (the "Term Loan"), which it used to refinance the existing Third-Party Lender debt that Fortress's investment had been structured, in part, to repay. Prior to executing the Term Sheet, TWG did not warn Fortress that its relationship with the Third-Party Lender had deteriorated, that it urgently needed substitute financing, or that it was pursuing the Term Loan in place of the financing contemplated by the Transaction. Instead, only at the last minute, after Fortress had devoted months and substantial resources to the Transaction, did Defendants disclose that TWG expected to obtain the Term Loan shortly. Even then, Defendants represented that the Term Loan was merely temporary and would not eliminate the need for Fortress's financing under the Term Sheet. On information and belief, those representations were false.

36. Once TWG secured the Term Loan, it determined that it no longer needed Fortress's investment and ceased working in good faith toward closing the Transaction.

37. On or about February 3, 2026, Knoble proposed either terminating the due diligence process outright or renegotiating the Term SheetProposed Terms. Knoble told Fortress that, because of claimed delays, "we have been forced to reconsider the transaction with Fortress," and presented "two paths forward": (i) "TWG and Fortress go our separate ways and pay our own legal fees," or (ii) a wholesale restructuring of the deal, including eliminating a portion of Fortress's return, removing certain guaranty and consent requirements and pledges of the principals' personal residences, and changing how the investment proceeds would be allocated and used.

38. The changes that Knoble sought with respect to the Term Sheet were materially different from the existing document.those set forth in the Proposed Terms referenced and incorporated into the Term Sheet. Among other things, Knoble sought to amend or eliminate

multiple provisions of the executed Term SheetProposed Terms that were fundamental to the parties' bargain, including provisions governing distributions, guarantees, and pledged collateral—core economic and structural protections that Fortress had negotiated and included in the Term Sheet and which were part of the consideration for committing substantial time and expense to the Transaction.

39. Knoble's demands were not good-faith counterproposals within the normal give-and-take of negotiations because, among other things, they were contrary to the Proposed Terms, which the parties had agreed constituted the "material terms and conditions" of the Transaction. Indeed, Knoble's changes dismantled the core economic and structural architecture of the Transaction.

40. A few days later, on February 11, 2026, Knoble demanded yet another sweeping revision: that BRL be removed from the Transaction altogether, notwithstanding that the LOI and Term Sheet and Proposed Terms expressly incorporated BRL as a subject of required consents, pledged collateral, and waterfall distributions.

41. Despite Defendants' efforts to discard much of the parties' negotiated Term Sheet, Fortress continued negotiating and, on February 13, 2026, emailed Defendants proposed modified deal terms that substantially acceded to the changes that Defendants had demanded.

42. Fortress's efforts proved futile. Later in February 2026, Knoble repudiated the Transaction and Defendants' Binding Obligations under the Term Sheet, telling Fortress that Defendants would not proceed with it.. Knoble further confirmed this repudiation in an email dated March 16, 2026, stating confirmed that the Transaction "will not come to fruition."

43. After Defendants repudiated the Transaction, on March 2, 2026, Fortress transmitted its legal and accounting invoices and requested reimbursement pursuant to Section 4 of the LOI.Term Sheet. Knoble responded that, despite Defendants' decision not to proceed with the Transaction, Defendants nevertheless intended to continue pursuing the Phase I Consents in an effort to avoid the reimbursement obligation they had undertaken in the LOITerm Sheet.

2. On March 16, Knoble proposed paying $250,000 of Fortress' out of pocket expenses in exchange for terminating the LOI.

44. After Fortress requested reimbursement, Knoble responded on March 2, 2026 that TWG was "continuing to obtain the consents necessary for the transaction, so these costs are all Fortress's responsibility," notwithstanding his simultaneous acknowledgement that TWG would not proceed with the Transaction.

45. On March 16, 2026, Knoble confirmed in writing both that "it is apparent that the deal will not come to fruition because the parties have not been able to reach agreement on a number of outstanding material items" and that TWG would nonetheless continue pursuing consents. Knoble further stated that TWG had incurred "approximately $400,000 in legal" fees pursuing the consents, and offered to pay only $250,000 of Fortress's out-of-pocket expenses "in exchange for an agreed termination of the Term Sheet."

46. On April 13, 2026, even after Knoble had confirmed that the deal was dead, Dustin Detzler, TWG's General Counsel, requested additional information and documents from Fortress purportedly in furtherance of TWG's pursuit of the Phase I Consents.

47. Given Defendants' repudiation, Fortress recognized that Defendants were attempting to use a post-repudiation consent exercise as a vehicle to evade the reimbursement obligation the LOITerm Sheet was designed to protect. Fortress declined to participate in that exercise. Fortress was under no contractual obligation to facilitate the consent process for a Transaction the Defendants had already repudiated, and Fortress's non-participation neither caused nor excused Defendants' failure to obtain the Phase I Consents.

48. On May 19, 2026, Fortress's counsel sent Defendants a formal demand letter seeking payment of Fortress's out-of-pocket costs and expenses, totaling $1,905,647.25, within ten business days.

49. Ultimately, the Transaction never closed. Defendants failed to obtain the Phase I Consents by June 30, 2026 and have refused to reimburse Fortress for its out-of-pocket costs and expenses as required by Section 4(b) of the ~~LOI~~Term Sheet.

**CLAIMS FOR RELIEF ~~FIRST CAUSE OF ACTION~~**

**COUNT I**

*(Breach of Contract (Failure to Negotiate Exclusively and in Good Faith))*
*Against All Defendants*

50. Fortress repeats and realleges the allegations set forth in paragraphs 1 through ~~38~~49 as if fully set forth herein.

51. The Binding Obligations of the August 29, 2025 ~~LOI is~~Term Sheet (Sections 2-10) constitute a valid and ~~binding~~enforceable contract among Fortress, TWG, Collins, and Knoble. The ~~LOI~~Term Sheet expressly provides that Sections 2 through 10 constitute "Binding Obligations" that are "binding on the Parties under all circumstances."

52. Section 4(a) of the ~~LOI~~Term Sheet required TWG and the Key Principals to negotiate exclusively and in good faith with Fortress during the Due Diligence Period with the goal of finalizing and executing Definitive Documentation before that period ~~expires~~expired on June 30, 2026.

53. Fortress performed its obligations under the ~~LOI~~Term Sheet and, in reliance on Defendants' binding commitments, devoted substantial time, professional resources, and expense to evaluating the Transaction, conducting due diligence, and working toward Definitive

Documentation and closing. Fortress incurred at least $1,905,647.25 in out-of-pocket costs and expenses in doing so.

54. Defendants breached Section 4(a) of the ~~LOI~~Term Sheet by failing to negotiate exclusively and in good faith with Fortress during the Due Diligence Period.

55. As set forth above, Defendants ~~stalled~~breached their obligation to negotiate the Transaction in good faith by, among other things, stalling the Transaction, including by failing to provide meaningful comments on drafts of key Transaction documents, including the loan documents, the operating agreement, and the joint venture agreement, and by leaving critical items on the parties' legal checklist unaddressed, thereby impeding progress toward Definitive Documentation and closing.

56. Defendants separately breached the exclusivity component of Section 4(a). During the exclusivity period, and without Fortress's consent, Defendants pursued and negotiated substitute financing that, upon information and belief, was designed to displace the very investment they had agreed to pursue exclusively with Fortress, culminating in the Term Loan described above. By negotiating a competing transaction intended to eliminate their need for Fortress's investment while the exclusivity period remained in force, Defendants failed to negotiate exclusively with Fortress as required by Section 4(a) of the Term Sheet.

57. Defendants' ~~breach~~breaches became explicit in February 2026, when Knoble advised Fortress that Defendants would no longer proceed with the Transaction on the agreed terms and thereafter proposed either terminating the due diligence process outright or fundamentally recasting the deal.

~~3. Defendants further breached the LOI by seeking to materially amend or eliminate multiple provisions of the executed Term Sheet that were fundamental to the~~

parties' bargain, including provisions governing distributions, guarantees, pledged collateral, and the role of BRL in the Transaction.

58. In addition to their failures to address key Transaction Documents, Defendants' breaches of their obligations to negotiate exclusively and in good faith under Section 4(a) was manifested by several specific acts, including: (a) falsely representing that the Term Loan was temporary financing and would not eliminate TWG's need for the financing contemplated by the Transaction; (b) negotiating and securing the Term Loan to refinance the Third-Party Lender debt and, upon obtaining that financing, disengaging from the Transaction because the Term Loan eliminated or substantially limited Defendants' need for the financing contemplated by the Transaction; (c) demanding, on February 3, 2026, either termination or a wholesale re-trade of core economic terms; (d) demanding, on February 11, 2026, the removal of BRL despite its central role in the Term Sheet's consent, collateral, and waterfall provisions; and (e) repudiating the Transaction before the Due Diligence Period expired.

59. The Proposed Terms attached as Exhibit A to the Term Sheet constituted the agreed framework within which the parties' Binding Obligation under Section 4(a) to "negotiate exclusively and in good faith with [each other] with the goal of finalizing and executing Definitive Documentation" required them to operate. By attempting to condition consummation of the Transaction on terms materially different from the parties' previously agreed-upon and heavily negotiated "material terms and conditions," Defendants failed to negotiate toward definitive agreements consistent with the Term Sheet and thereby breached their contractual obligation to negotiate in good faith. Defendants' insistence on conditions that did not conform to that framework constituted a breach of the Section 4(a) duty, independent of whether the Proposed Terms were themselves binding to close the Transaction.

60. Notwithstanding Defendants' efforts to re-trade the negotiated terms, Fortress offered to modify the deal largely consistent with TWG's proposed modifications. However, even with Fortress's offer, it became clear Defendants had no interest in proceeding However, even with Fortress's offer, it became clear Defendants had no interest in proceeding. Defendants' refusal to proceed even after Fortress had acceded to substantially all of the changes Defendants demanded confirms that Defendants professed disagreements were pretextual, and that Defendants, having obtained substitute financing, through the Term Loan, which eliminated or substantially limited their perceived need for Fortress's investment, had already resolved to abandon the Transaction rather than negotiate in good faith toward Definitive Documentation. Defendants' conduct did not reflect a good faith impasse, but a unilateral, bad faith abandonment of the parties' agreed negotiation framework.

61. Knoble thereafter confirmed in writing that the Transaction "will not come to fruition," thereby repudiating Defendants' obligation to continue negotiating in good faith through the expiration of the Due Diligence Period.

62. Defendants' conduct constituted a material breach of Section 4(a) of the LOITerm Sheet.

63. As a direct and proximate result of Defendants' breach, Fortress has suffered reliance damages, including at least $1,905,647.25 in out-of-pocket costs and expenses, as well as benefit in reliance on Defendants' Binding Obligation to negotiate exclusively and in good faith. Fortress seeks recovery of the bargain those damages in an amount to be proven at trial.under this claim only to the extent they are not fully recovered under the Second Cause of Action. Such out-of-pocket costs and expenses are recoverable as reliance damages for breach of a contractual obligation to negotiate in good faith.

64. Fortress is entitled to recover compensatory damages, pre-judgment interest, post-judgment interest, reasonable attorneys' fees and costs pursuant to Section 7 of the ~~LOI~~Term Sheet, and such other and further relief as the Court deems just and proper.

~~**SECOND CAUSE OF ACTION**~~

**COUNT II**

*(Breach of Contract (Failure to Reimburse Costs))*
*Against All Defendants*

65. Fortress repeats and realleges the allegations set forth in paragraphs 1 through ~~51~~64 as if fully set forth herein.

66. Section 4(b) of the ~~LOI~~Term Sheet provides that if all Phase I Consents "acceptable to Fortress" were not received before the expiration of the Due Diligence Period, then TWG and the Key Principals would, on a joint and several basis, reimburse Fortress on demand for all out-of-pocket costs and expenses incurred by or on behalf of Fortress and its affiliates in pursuing the Transaction, including, without limitation, the costs of drafting and negotiating definitive documentation.

67. Defendants breached Section 4(b), an independent Binding Obligation, by failing to reimburse Fortress for its out-of-pocket costs and expenses after the Phase I Consents were not received before the expiration of the Due Diligence Period.

68. Fortress incurred at least $1,905,647.25 in out-of-pocket costs and expenses in connection with pursuing the Transaction.

69. As alleged above, before the Due Diligence Period expired, Defendants repudiated the Transaction~~, refused~~ and their Binding Obligations under the Term Sheet by refusing to proceed on the agreed "material terms~~,~~ and conditions," sought to strip out material

components of the negotiated deal structure, and stated that the Transaction "will not come to fruition." In doing so, Defendants made clear that they would not perform the Transaction contemplated by the LOITerm Sheet and attached Term SheetProposed Terms, including obtaining the Phase I Consents.

70. The Phase I Consents were among the Transaction's agreed "material terms and conditions" and were required, together with the other agreed material terms reflected in the Proposed Terms, to effectuate the Transaction. The parties did not contemplate that the Phase I Consents would be obtained or pursued independently of the Transaction or after Defendants had repudiated the Transaction.

71. Non-occurrence of the Phase I Consents was caused by Defendants. Defendants frustrated and prevented the consents by refinancing the underlying debt with the Third-Party Lender, disengaging from negotiations, demanding the removal of BRL (a required Phase I Consent), and repudiating the Transaction. Having repudiated, Defendants could not deliver consents "acceptable to Fortress," and their post-repudiation "consents" effort was undertaken solely to manufacture a defense to reimbursement, as Defendants themselves acknowledged.

72. The Phase I Consents required under Section 4(b) of the Term Sheet were organized around and conditioned on the material Proposed Terms set forth in Exhibit A. Those consents required third-party approval of material aspects of the proposed transaction, including Fortress's investment and ownership interests, related organizational changes in TWG and TWG affiliates, and the pledge of BRL shares. Defendants' demands to remove BRL and materially alter the proposed transaction's financing, collateral, and credit-support structure undermined the very Transaction for which those approvals were sought. By insisting on terms that

fundamentally departed from the agreed Proposed Terms, Defendants made the Phase I Consents unobtainable and frustrated the condition on which the reimbursement obligation was premised.

73. Further, Fortress's cooperation was neither necessary to, nor the cause of, the non-occurrence of the Phase I Consents. That non-occurrence resulted from Defendants' repudiation and their insistence on terms that rendered the consents unobtainable.

74. After Defendants repudiated the Transaction, Fortress formally demanded that Defendants reimburse Fortress for at least $1,905,647.25 in out-of-pocket costs and expenses. Defendants have refused to do so.

75. Defendants never satisfied Section 4(b)'s condition to provide Phase I Consents acceptable to Fortress. Likewise, Defendants never satisfied the resulting contractual obligation to reimburse Fortress for "all" of its "out-of-pocket" costs and expenses incurred in connection with pursuing the Transaction, including, without limitation, in drafting and negotiating the deal documents.

76. Defendants' failure to reimburse Fortress upon demand constitutes a breach of Section 4(b) of the ~~LOI~~Term Sheet.

77. As a direct and proximate result of Defendants' breach, Fortress has suffered damages of at least $1,905,647.25.

78. Fortress is entitled to recover compensatory damages of at least $1,905,647.25, pre-judgment interest, post-judgment interest, reasonable attorneys' fees and costs pursuant to Section 7 of the ~~LOI~~Term Sheet, and such other and further relief as the Court deems just and proper.

**~~THIRD CAUSE OF ACTION~~**

## COUNT III

*(Breach of Implied Covenant of Good Faith and Fair Dealing)*
*Against All Defendants*

79. Fortress repeats and realleges the allegations set forth in paragraphs 1 through ~~61~~78 as if fully set forth herein.

80. To the extent Defendants dispute the existence, scope, or enforceability of the express Binding Obligations in Sections 4(a) and 4(b), this cause of action is pleaded in the alternative to the First and Second Causes of Action pursuant to Fed. R. Civ. P. 8(d)(2)–(3). This cause of action is also pleaded independently based on Defendants' distinct post-repudiation conduct alleged below.

81. Under New York law, every contract contains an implied covenant of good faith and fair dealing, which prohibits either party from acting in a manner that, although not expressly forbidden by the contract, would deprive the other of the fruits of the bargain.

82. As alleged above, Defendants abandoned the Transaction after Fortress had already devoted substantial time, professional resources, and expense to diligence and documentation, and then took the position that they could continue pursuing consents after repudiation in an effort to nullify the reimbursement protection for which Fortress had bargained. That conduct frustrated the purpose of the ~~LOI~~Term Sheet, deprived Fortress of the benefit of its bargain, and rendered illusory the contractual protection Defendants had granted to induce Fortress to incur those costs.

83. Independent of the express breaches alleged above, Defendants breached the implied covenant through distinct post-repudiation conduct: after deciding not to proceed with the Transaction, Defendants announced they would continue pursuing Phase I Consents and demanded that Fortress produce highly confidential and sensitive information, solely to construct

a pretextual defense to their reimbursement obligation and to deprive Fortress of the benefit of the Section 4(b) protection for which it had bargained. To the extent this pretextual, post-repudiation course of conduct is not governed by the express terms of Section 4(a) and 4(b), it is independently actionable under the implied covenant of good faith and fair dealing.

84. The Phase I Consents were among the Transaction's agreed "material terms and conditions" and were required, together with the other agreed material terms reflected in the Proposed Terms, to effectuate the Transaction. The parties did not contemplate that the Phase I Consents would be obtained or pursued independently of the Transaction or after Defendants had repudiated the Transaction. Defendants therefore breached the implied covenant of good faith and fair dealing by invoking purported post-repudiation efforts to obtain the Phase I Consents as a pretext to avoid their reimbursement obligations under Section 4(b) and deprive Fortress of the benefit of its bargain.

85. As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Fortress has suffered damages, including at least $1,905,647.25 in unreimbursed out-of-pocket costs and expenses~~, as well as benefit of the bargain damages in an amount to be~~. Fortress seeks recovery of those damages under this claim only to the extent they are not recovered under the First or Second Cause of Action, together with any other compensatory damages available under law and proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Fortress respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

(a) Compensatory damages in an amount to be determined at trial, including at least $1,905,647.25 in unreimbursed out-of-pocket costs and expenses incurred by Fortress in pursuing the Transaction;

~~1. Benefit-of-the-bargain damages in an amount to be determined at trial;~~

(b) Pre-judgment interest as permitted by law;

(c) Post-judgment interest as permitted by law;

(d) Reasonable attorneys' fees and costs pursuant to Section 7 of the ~~LOI~~Term Sheet; and

(e) Such other and further relief as the Court deems just and proper.

Dated: New York, New York ~~July 6~~
September 25, 2026

**SCHINDLER COHEN & HOCHMAN LLP**

By: ______________________

Matthew A. Katz
J. Marcos Otazu
100 Wall Street, 15th Floor
New York, New York 10005
(212) 277-6315
mkatz@schlaw.com
jmotazu@schlaw.com

*Attorneys for Plaintiff Fortress Credit Advisors LLC*