# EXHIBIT B

FORTRESS

2494 Sand Hill Road
Menlo Park, CA 94025
415-284-7400

August 29, 2025

TWG Development, LLC
1301 E. Washington St, Suite 100
Indianapolis, IN 46202
Attn: Justin Collins and Louis Knoble

*Re: Offer to Invest in TWG Development*

Gentlemen,

We enjoyed speaking with you and discussing the possibility of Fortress Credit Advisors LLC or one of its affiliates ("**Fortress**") investing in TWG Development, LLC (the "**Company**"). Fortress and the Company are sometimes referred to herein each individually as a "**Party**" and collectively as the "**Parties**". This letter and the Proposed Terms attached hereto (collectively, this "**Term Sheet**") hereby amend and restate in its entirety that certain Term Sheet dated as of May 21, 2025 amongst the Parties.

1. Exhibit A attached hereto (the "**Proposed Terms**") outlines certain of the proposed material terms and conditions regarding the proposed investment by Fortress in the Company and related transactions among Fortress and Justin Collins and Louis Knoble, the controlling principals of the Company (the "**Key Principals**") (collectively, the "**Transaction**").

2. This Term Sheet is for discussion purposes, is intended as an outline only of the basic terms upon which Fortress willing to consider entering into the Transaction, does not address all matters upon which agreement must be reached in order for the Transaction to be consummated, and is not intended to be, and shall not be, a commitment by either Party to enter into the Transaction. With the exception of this Section 2 through Section 10 (inclusive) of this letter (collectively, the "**Binding Obligations**"), which shall be binding on the Parties under all circumstances, this Term Sheet shall not be a binding commitment between the Parties to enter into the Transaction. A binding commitment between the Parties regarding the Transaction will exist among the Parties only if and to the extent set forth in definitive, binding documentation regarding the Transaction executed and delivered by the Parties.

3. Fortress shall be given an exclusive due diligence period (the "**Due Diligence Period**") which shall commence on the date of this Term Sheet and expire on June 30, 2026 in order to conduct due diligence. Promptly following the mutual execution and delivery of this Term Sheet, the Parties shall commence negotiation of definitive documentation to effectuate the Transaction (collectively, the "**Definitive Documentation**"). If Definitive Documentation has not been executed on or prior to the expiration of the Due Diligence Period, then either Party shall have the right, in its sole and absolute discretion, to terminate this Term Sheet and determine not to consummate the Transaction.

4. In consideration of Fortress's expenditure of time and expense in evaluating the Transaction, (a) commencing as of execution of this Term Sheet and continuing until expiration of the Due Diligence Period, neither the Company nor the Key Principals (i) shall (and shall not permit any of the Company's members, partners, shareholders, affiliates, subsidiaries, employees, officers, directors, agents or representatives to), directly or indirectly, enter into any agreement, make or accept any offer or otherwise engage in any discussion or negotiation with any other party relating to an investment in the Company and

(ii) shall negotiate exclusively and in good faith with Fortress with the goal of finalizing and executing Definitive Documentation at or prior to expiration of the Due Diligence Period and (b) if all of the "Phase I Consents" (as noted in the Proposed Terms) are not received by the Parties prior to the expiration of the Due Diligence Period, then the Company and the Key Principals shall, on a joint and several basis, reimburse Fortress on demand for all out-of-pocket costs and expenses incurred by or on behalf of Fortress and its Affiliates in connection with pursuing the Transaction, including, without limitation, in drafting and negotiating the forms of Definitive Documentation.

5. The Company and the Key Principals agree to keep the existence and contents of this Term Sheet and the Transaction confidential, except as (i) may be required by a judicial or administrative proceeding or as otherwise required by law and/or, (ii) on a strictly confidential and "need to know" basis, solely to their (and their affiliates') respective directors, officers, employees, professional advisors, and actual or potential partners, investors and lenders in each case who agree to keep the same confidential. The provisions of this Section 6 shall survive the expiration or termination of this Term Sheet.

6. This Term Sheet shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed within such State. The parties hereto (a) irrevocably consent to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan of the City of New York, and (b) irrevocably consent that any process or notice or motion or other application to the court or judge thereof may be served within or outside of the State of New York by registered or certified mail or nationally-recognized overnight delivery service, or by personal service, provided a reasonable time for appearance is allowed. EACH PARTY TO THIS TERM SHEET HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING, WHETHER AT LAW OR EQUITY, BROUGHT BY ANY OF THEM IN CONNECTION WITH THIS TERM SHEET AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7. If any legal action, suit or proceeding is commenced between the Parties regarding their respective rights and obligations under this Term Sheet, the prevailing party shall be entitled to recover, in addition to damages or other relief, reasonable out of pocket costs and expenses, reasonable out of pocket attorneys' fees and court costs (including, without limitation, reasonable out of pocket expert witness fees). As used herein, the term "prevailing party" shall mean the party which obtains the principal relief it has sought, whether by compromise settlement or judgment. If the Party which commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other Party, such other Party shall be deemed the prevailing party. The provisions of this Section 8 will survive any expiration or termination of this Term Sheet.

8. Each Party represents and confirms that it has not engaged or worked with a broker or agent in connection with the Transaction other than Northmarq ("**Broker**"). Each Party shall indemnify, defend and hold harmless the other from and against all costs, finder's fees, commissions, concessions, remuneration or similar fee or compensation incurred by the other Party relating to the Transaction payable to anyone other than Broker to the extent claimed through such party. The provisions of this Section 10 will survive any expiration or termination of this Term Sheet.

9. This Term Sheet supersedes all prior discussions, agreements, negotiations and understandings, whether oral or written, of the parties with respect to the Transaction. This Term Sheet may be executed in two or more counterparts, each of which, when so executed and delivered, shall be deemed to be an original, but all of which counterparts, taken together, shall constitute one and the same instrument. Counterparts of this Term Sheet may be executed and delivered by the parties as PDF copies or via other electronic means and any such electronic copy of an executed counterpart shall be binding and of the same force and effect as an original executed counterpart. Any amendment hereto to be effective must be in

writing and signed by all parties hereto. No waiver of any provision hereof shall be effective as against any party hereto unless such party has waived such terms or provision in writing.

10. Should the terms and conditions of this Term Sheet meet with your approval, please indicate your acceptance by signing this Term Sheet and returning a copy of this Term Sheet to Fortress by 5:00 p.m. PST on August 29, 2025. If an executed counterpart of this Term Sheet is not delivered prior to such time, then this Term Sheet shall be deemed null and void *ab initio*, and shall be of no further force or effect.

[*Signature Page Follows*]

Sincerely,

**FORTRESS CREDIT ADVISORS LLC**

By: ______________________________
Name: David Hammerman
Title: Chief Operating Officer

Agreed and Accepted as of the date first written above:

**TWG DEVELOPMENT, LLC**

By: DocuSigned by: 2771B54E44CA443...
Name: Louis Knoble
Title: CEO

Key Principals

By: DocuSigned by: BEAD4CE83C1A4C3...
Name: Justin Collins

By: DocuSigned by: 2771B54E44CA443...
Name: Louis Knoble

**EXHIBIT A**

**OUTLINE OF PROPOSED TERMS AND CONDITIONS**

1. **Estimated Company Valuation:** $155,000,000 (i.e. 2025E Company EBITDA x 8.0) (subject to Fortress due diligence) (the "**Company Value**").

2. **Fortress Investment**: an amount equal to the sum of (a) $[81.2] million plus (b) TBD closing costs, in exchange for an initial 35% ownership interest in the Company and the nominal interest in TWG GP III described below. A portion of Fortress's investment in the estimated amount of $35,428,728 (the "**Company Component**") will be applied to repay certain obligations of the Company as detailed on **Schedule 1** hereto, and a portion of Fortress's investment in the estimated amount of $45,771,272 plus Transaction closing costs (the "**Balance Sheet Component**") will be applied to repay certain obligations related to the real estate owned by TWG GP III LLC (an entity controlled by the Key Principals) ("**TWG GP III**") and its subsidiaries, which are owned through the Key Principals' balance sheet outside of the Company, as detailed on **Schedule 1** hereto and to fund a shortfall reserve (the "**Shortfall Reserve**") in the amount of $3,500,000 for shortfalls at the Balance Sheet Real Estate Assets.

3. **Fortress Minimum Return**: means the sum of (i) the return of all of Fortress's invested capital (including the Company Component and the Balance Sheet Component) plus (ii) a 17.0% annual rate of return on all such invested and then outstanding capital (compounding monthly) (collectively, the "**Fortress Minimum Return**"). The portion of the Fortress Minimum Return consisting of the return of the principal amount of the Balance Sheet Component plus a 17.0% annual rate of return on the Balance Sheet Component shall be referred to herein as the "**BSC Minimum Return**". The portion of the Fortress Minimum Return consisting of the return of the principal amount of the Company Component plus a 17.0% annual rate of return on the Company Component shall be referred to herein as the "**CC Minimum Return**".

    a. On a monthly basis, the Company shall be required to pay to Fortress a current return on the outstanding Balance Sheet Component (the "**Current Return**") in the amount of (i) 0% during the first twelve (12) months following Closing, (ii) a 5% annual rate of return during months 13-24 after Closing and (iii) a 10% annual rate of return on the outstanding Balance Sheet Component thereafter.

    b. On a semi-annual basis (i.e., every 6 months) starting on the date which is 18 months after the Closing, the Company shall be required to pay to Fortress a TBD minimum amount (the "**Amortization Payment**") so that the BSC Minimum Return shall have been paid in full by the date which is 48 months after the Closing.

    c. An example of the calculation of the Fortress Minimum Return and the Current Return is set forth on **Schedule 2** hereto.

4. **Balance Sheet Real Estate**:

    a. The Key Principals collectively own 100% of TWG GP III, which owns (i) 88% of TWG GP IV LLC ("**TWG GP IV**") and (ii) 94% of TWG GP V LLC ("**TWG GP V**"). TWG GP IV and TWG GP V own interests in various real estate assets, including their interests in the market rate and affordable housing developments listed on **Schedule 3** hereto (the "**Balance Sheet Real Estate Assets**").

b. From and after the closing of the Transaction (the "**Closing**"), all new real estate interests acquired directly or indirectly by the Key Principals shall be owned in a newly formed entity ("**TWG GP VI**"). TWG GP IV, TWG GP V and TWG GP VI are collectively referred to herein as the "**Balance Sheet Real Estate Entities**".

c. At Closing, Fortress will be admitted as a member of TWG GP III with a nominal interest in TWG GP III and the LLC agreement for TWG GP III will be amended and restated and will provide that Fortress will have the right, upon the occurrence of a Trigger Event, to require the Key Principals to cause TWG GP III to cause TWG GP IV and/or TWG GP V to sell such number of properties/interests in properties as is needed, as identified by Fortress, for no less than the applicable Minimum Release price, for Fortress to be repaid in full (market rate housing developments to be sold within 9 months of Fortress notifying the Key Principals of its election to force a sale, and affordable housing developments to be sold within 15 months of Fortress notifying the Key Principals of its election to force a sale). Fortress will be redeemed as a member of TWG GP III upon Fortress receiving the Fortress Minimum Return. Failure of such sales to occur within the foregoing timeframes will constitute a "**Sale Event Failure**".

d. Notwithstanding the provisions under "Fortress Control Rights" below, sales of assets owned by the Balance Sheet Real Estate Entities will be permitted without Fortress's approval so long as the sale price results in equity distributions to the applicable Balance Sheet Real Estate Entity in an amount not less than a minimum amount to be agreed upon during diligence and set forth in Definitive Documentation (i.e., the midpoint of the BOV's (or TBD market value for deals that BOVs were not obtained)) (for each asset, the "**Minimum Release Price**").

e. Shortfalls in available funds at the Balance Sheet Real Estate Assets will be funded from the Shortfall Reserve subject to customary draw mechanisms to be detailed in the Definitive Documentation. To the extent the Balance Sheet Entities require funds in excess of the amounts in the Shortfall Reserve to cover shortfalls (a "**TWG GP Net Shortfall**"), the Key Principals shall fund such TWG GP Net Shortfalls. Failure to do so shall constitute a default under the Definitive Documentation. In addition to any other available remedies, Fortress will have the option to fund any such unfunded TWG GP Net Shortfall and the same shall be added to the Balance Sheet Component.

5. **Waterfall:**

a. The Company will not make any distributions for the first 12 months following Closing. During months 13-24 following Closing the Company will distribute at least 50% of free cash flow, and thereafter will distribute at least 75% of free cash flow annually.

[NTD: Tax analysis, tax distributions, etc. TBD]

b. All distributions by the Company and all distributions by the Balance Sheet Real Estate Entities and, during a Trigger Event, all distributions to TWG GP III and/or the Key Principals from Big Red Liquor shall, in each case, be paid as follows:

i. First, 100% to Fortress until Fortress has received the BSC Minimum Return (with any amounts first applied to the Fortress Minimum Return on the Balance Sheet Component and then to the return of the Balance Sheet Component);

ii. Second, 100% to Fortress until Fortress has received the CC Minimum Return (with any amounts first applied to the Fortress Minimum Return on the Company Component and then to the return of the Company Component); and

iii. Thereafter, as applicable, (x) pro rata to the respective shareholders of the Company and/or the Balance Sheet Real Estate Entities, as applicable, or (y) to TWG GP III and/or the Key Principals as it relates to the distributions from Big Red Liquor.

6. **Future Capital Needs of the Company (if any)**: it is not anticipated that the Company will require additional cash infusions to cover operations, however, if the Company needs additional capital in the future to cover shortfalls (including without limitation operating shortfalls, repayment of maturing debt or construction overruns) ("**Required Capital**"), then the shareholders of the Company will fund their pro rata percentage of such Required Capital, and any Required Capital funded by Fortress on behalf of any non-Fortress shareholders will be added to the Balance Sheet Component.

7. **Future Company Acquisitions/Developments**: it is expected that going forward, the Company will fund the GP capital requirement for pre-development/land costs of going forward market rate and affordable deals through either TWG GP VI or, with the consent of Fortress, a line of credit for the benefit of the Company. Fortress will receive ownership of 35% (or 50% if Fortress exercises its right to increase its ownership interests in the Company) in the GP interest in any such deal.

8. **Future Fortress LP and GP Capital:** Fortress is willing to fund LP capital in joint ventures with the Company to finance future acquisitions and developments subject Fortress approval of such assets. The Company shall also fund the GP capital in any such deals. By way of example, if the deal is 90/10 (LP to GP equity), Fortress may invest the 90% as the LP, and the Company would contribute the GP capital.

9. **Fortress Control Rights**: Fortress will have representation on the board of directors of the Company and will receive major decision approval rights (i.e. annual budget approvals, Company debt and refinances, new developments, asset sales and refinances (subject to Paragraph 7 procedures to be further laid out in the Definitive Documentation), etc.) to be set forth in Definitive Documentation. Fortress will have the right to take a controlling position on the board of directors of the Company upon the occurrence of any of the following (each, a "**Removal Event**"): (i) fraud, gross negligence or willful misconduct by the Company or any Key Principal, (ii) failure of the Company to pay the Current Return for three (3) consecutive months, provided that by the end of said 3rd month, all accrued and unpaid Current Return has been paid, (iii) failure of the Company to pay any Amortization Payment, (iv) a Sale Event Failure, (v) failure of the Key Principals to fund any TWG GP III Net Shortfall, (vi) failure of non-Fortress shareholders to fund Required Capital, (vii) TBD performance thresholds to be set forth in Definitive Documentation, (viii) material breach of Definitive Documentation (subject to appropriate cure rights to be detailed therein), (ix) failure to obtain 75% of the Phase II Consents within 12 months after the Closing, or (x) if the Key Principals violate certain minimum ownership/key man control requirements to be set forth in Definitive Documentation or fail to spend the majority of their time on Company business.

10. **Additional Security**: To secure repayment of the Fortress Minimum Return and the obligations of the Key Principals, Company and/or Balance Sheet Real Estate Entities under any of the Definitive Documents, Fortress will receive the following collateral pledge:

a. Pledge of shares held by TWG GP III and/or the Key Principals in Big Red Liquor.

11. **Guaranty**: the Key Principals will jointly and severally guarantee to Fortress (1) the payment of the BSC Minimum Return, (2) the payment of the full Fortress Minimum Return in the event of the occurrence of a Removal Event (other than the performance test, failure to pay the Current Return or the failure to pay the Amortization Payments), and (3) the funding to TWG GP III of any TWG GP III Net Shortfall. The payment guaranty shall become due and payable upon the occurrence of a Removal Event.

12. **Forced Sale Right**: Upon the occurrence of a Trigger Event, Fortress will have the option to require the Key Principals to cause TWG GP III to cause the TWG GP IV or TWG GP V to sell such number of properties/interests in properties as is needed, as identified by Fortress, for no less than the applicable Minimum Release price, for Fortress to be repaid in full (market rate housing developments to be sold within 9 months of Fortress notifying the Key Principals of its election to force a sale, and affordable housing developments to be sold within 15 months of Fortress notifying the Key Principals of its election to force a sale). A "**Trigger Event**" means the earlier of (i) the occurrence of a Removal Event or (ii) the date which is 5 years after Closing if at such time Fortress has not received the full Fortress Minimum Return.

13. **Company Forced Sale Right**: At any time after the earlier of the tenth (10th) anniversary of the Closing and a Removal Event, Fortress shall have the right to force a sale of the Company, subject to a right of first offer in favor of the Key Principals set forth in the Definitive Documents.

14. **Non-Compete**: For so long as Fortress remains a shareholder of the Company, the Key Principals shall not (directly or through another venture or company) engage in business activities that are competitive with the Company. A burn off to be discussed as part of the Definitive Documents.

15. **Company Warrants:** The Definitive Documentation will provide that Fortress will have a right at any time following Closing to purchase an additional 15% of the equity in the Company at a price based on the Company Value (as defined above).

16. **Structure**. The Parities agree Fortress and the Key Principals will form a Delaware limited liability company ("**TWG Development Holdco**") to acquire 100% of the limited liability company interests in the Company, and all references in this Exhibit A to the "Company" shall, as applicable, refer to the TWG Development Holdco.

17. **Required Consents**.

    a. The Closing will be conditioned upon receipt of consents acceptable to Fortress from all requisite third party lenders, investors and other financing partners which affirmatively approve the following: (i) Fortress being admitted as a member of TWG GP III with a nominal interest in TWG GP III and the economic rights set forth herein; and (ii) the implementation of TWG Development Holdco and Fortress acquiring an initial 35% interest in the Company (and up to 50% of the interests in the Company) (and all rights related thereto); and (iii) the pledge of shares in Big Red Liquor (in each case, to the extent such consents are required under the applicable documents) (the "**Phase I Consents**").

    b. The Key Principals will use commercially reasonable efforts to obtain within 12 months after Closing consents acceptable to Fortress from all requisite third party lenders, investors and other financing partners on all market rate Balance Sheet Real Estate Assets which

affirmatively approve of Fortress having the right to take control upon the occurrence of a Trigger Event (the "**Phase II Consents**").

.